## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

DR. STEPHEN RAMB, as
Administrator of Werner Wicker's
Estate, and WICKER, LLC,

     Plaintiffs,

     v.

PRABHU PARAMATMA, *et al.*,

     Defendants.

Civil Action No.

2:19-cv-21-RWS

## **ORDER**

This case comes before the Court on cross-motions seeking partial summary judgment filed by Plaintiffs [Dkt. 497] and Defendants Tim House and TJH, Inc. ("House Defendants" or "House") [Dkts. 498, 514 (Revised Memorandum of Law)]. The parties' respective Motions for Partial Summary Judgment ("MPSJ") seek judgment as a matter of law on portions or sub-parts of certain causes of action alleged within Plaintiffs' Second Amended Complaint ("SAC") [Dkt. 238]. In addition, the following motions are also before the Court: Plaintiffs' Motions to Strike the House Defendants' MPSJ [Dkt. 516] and Defendants' Reply Brief [Dkt. 527] or, alternatively, for Leave to File a Sur-reply. Having reviewed the record, the Court enters the following Order.

## BACKGROUND

This highly contentious action involves allegations of a complex, multi-million-dollar conspiracy to commit fraud spanning from 2014 through 2019 and committed against Werner Wicker ("Wicker"), deceased, and Wicker, LLC by Defendants Prabhu Paramatma ("Paramatma"), Louis Beria ("Beria"), and Timothy House ("House").  Plaintiffs assert an array of claims for breaches of trust, loyalty, and fiduciary duty, fraud, and violations of state and federal RICO statutes.  Absent a global settlement, disposition of this case is going to require a jury trial.

Although aspects of the case have been resolved, an overview of the parties, their relationships and alliances, and the respective roles of the individual and corporate defendants involved is required.

### I.      Factual Background

### A. Werner Wicker & Prabhu Paramatma

At the commencement of this case, Plaintiff Werner Wicker was a wealthy, 83-year-old German national who was unable to read or speak English.[1]  Wicker

---

[1] Wicker passed away in July 2020, and Dr. Stephen Ramb was substituted for the Wicker Estate.  [Dkt. 357].

and Defendant Paramatma were involved in a close spiritual and personal relationship.

In 2013, Wicker began investing in multi-million-dollar real estate transactions in New York and Georgia. Wicker appointed Paramatma as his Power of Attorney ("POA") to handle his real estate transactions in the United States. [Dkt. 152-5].

The Georgia real estate transactions are the focus of the parties' cross-motions for partial summary judgment.  The underlying transactions include purchases of the River Property, the Redding Property, and the Westminster Apartments (collectively, "the Properties").[2]  Resolution of the legal issues and the Court's analysis is informed by the written agreements and other communications concerning these transactions between Werner Wicker, deceased, Paramatma, Beria, the House Defendants, and LoTi Investment and Management Group, LLC ("LoTi").

---

[2] As observed in the Court's September 16, 2021 Order, Plaintiffs' SAC relies upon the River and Redding Property transactions, at least in part, in eleven of sixteen counts, and most of the claims concerning the Westminster Apartments transaction have been resolved.  [Dkt. 482 (citing Dkt. 323-2 at 2) (CM/ECF pagination)].  Page numbers referenced by the Court's Order refer to CM/ECF pagination.

There is a fourth Georgia real estate transaction that is the subject of a

related civil case, the Etowah River Property.[3]  Defendants' filings occasionally

reference the Etowah River Property or "the North Forsyth Properties" in

discussion. Although related, the Etowah River Property case is not before the

Court at this time.

## B. The House Defendants

House is a resident of Georgia who has worked in real estate for many years.

House owns and operates TJH.

In late 2013, Beria and House met for the first time when Beria approached

House about finding potential investment properties for a German investor

(Wicker).  [May 20, 2020 Deposition of Louis Beria ("Beria Dep."), Vol. I, 117-

118].  Beria had never conducted any business in the State of Georgia prior to

2014.  [Id.].  In the spring of 2014, Beria brought Wicker and Paramatma to

Atlanta to meet House and to view potential investment properties.  House found

---

[3] In 2019, TJH and Etowah Development Partners, LLC, commenced an action in
state court against Wicker, LLC for an alleged breach of contract.  See TJH, Inc.,
et al. v. Wicker, LLC, State Court Action No. 19CV4507.  The related civil action
was subsequently removed to this Court from the Superior Court of DeKalb
County, Georgia, by Wicker, LLC.  See TJH, Inc., et al. v. Wicker, LLC, NDGA
Civil Action No. 2:19-cv-87-RWS.  The parties agreed to a stay of the Etowah
River Property action (and Plaintiffs' motion for injunctive relief) pending the
outcome and disposition of the instant case.

and presented the subject Properties (i.e., the River & Redding Properties, the Westminster Apartments, and the Etowah River Property) to Wicker for investment and, in some instances, negotiated purchases with the seller on Wicker's behalf.  House was compensated generously in connection with each purchase transaction.

In addition to identifying the real property, House, via TJH, oversaw the development of the River and Redding Properties.  House was responsible for performing work on the Properties under a "Land Clearing Agreement" ("LCA") and a "Lot Development Agreement" ("LDA").  The enforceability of these and other written agreements are challenged by Plaintiffs on numerous grounds. The development work was performed or contracted for through LoTi, in which both House and Beria had an ownership interest.

**C. LoTi**

LoTi, formed May 30, 2014, was owned and operated by Tim House and Louis Beria through their respective businesses.[4]  LoTi had two members, TJH,

---

[4] Plaintiffs state that House came up with the name "LoTi," meaning "Laughing on the inside." [Dkt. 502-21 (5/21/14 Email from House to Beria suggesting "possible corp names")].  According to the House Defendants, the name "LoTi" was derived from Beria's first name and House's first name, i.e., Louis + Tim. [Dkt. 521 at 3 n.1].

and LSC1 Management Corporation ("LSC1"). Thus, House, as owner of TJH, had an ownership interest in LoTi. Similarly, Beria had an ownership interest in LoTi through LSC1 as its sole owner. LoTi made House and Beria business partners and called for TJH (House) and LSC1 (Beria) to split their profits 50/50. [May 8, 2020 Deposition of Timothy House ("House Dep.") 274-276, 354]. LoTi was dissolved on October 4, 2016.

### D. Beria Conviction & Default Judgment as to Liability -- Beria, LSC1, and LoTi

On November 4, 2020, Beria pled guilty by information to wire fraud in violation of 18 U.S.C. § 1343 for conduct related to this civil action, including actions he took on behalf of LoTi while hiding his ownership interest in LoTi from Wicker. [See United States v. Beria, Criminal No. 2:20-cr-53-RWS, Dkts. 3, 5, 5-1, 7 (Transcript of Plea & Rule 11 Proceeding) at 18-22]. The factual basis offered in support of Beria's guilty plea was read into the record by the Assistant United States Attorney and outlined Beria's admission and acceptance of responsibility for perpetrating an egregious fraud on Wicker, making false representations to Wicker, and misappropriating funds designated for the Westminster Apartments Property. Beria reported to federal prison June 2, 2021 and subsequently defaulted in the present case.

On December 8, 2021, the Court granted Plaintiffs' Motion for Default Judgment as to Liability [Dkt. 487] as to LSC1 and LoTi.  [Dkt. 490].  On January 12, 2022, pursuant to FED. R. CIV. P. 55(a), default as to liability was entered against Beria on all claims asserted against him in Plaintiffs' SAC.  [Dkts. 493, 494].  The amount of damages awarded will be determined at trial.

### E. Wicker's Georgia Real Estate Transactions

Plaintiffs challenge the monetary payments received by House, TJH, and LoTi in connection with Wicker's purchases of real property and reported development of the subject Properties.  Wicker was not a signatory on many key documents.  Rather, in each real estate purchase, Paramatma executed the necessary documents on Wicker's behalf pursuant to either the POA or an alleged membership in Wicker, LLC.

### 1.  The River Property

On May 16, 2014, Wicker acquired a 750(+/-) acre tract in Forsyth County referred to as the "River Property."  [Dkt. 500-1 - Plaintiffs' Statement of Material Facts ("PSMF") 1].  House identified the River Property as a potential investment property for Wicker and negotiated the purchase price with the seller on Wicker's behalf.  [House Dep. 262, 269].

The actual purchase price for the River Property was $12.1 million dollars, but this was not disclosed to Wicker. [PSMF 2]. Beria and Paramatma misrepresented the purchase price to Wicker, inducing him to pay $19.5 million instead - $7.4 million more than the actual purchase price. [PSMF 3-7, 12]. LSC1/Beria produced a different (altered) agreement reflecting the inflated purchase price, the seller's principal's signature, and Paramatma's signature dated May 16, 2014. [PSMF 8]. House asserts that he never saw the altered agreement with the $19.5 million purchase price prior to this litigation.

TJH received a payment of $1.5 million. [PSMF 19; House Dep. 270]. The $1.5 million was split 50/50 with LSC1, the other LoTi member. LSC1 received a payment of $5,781,000. [PSMF 15, 16]. House was paid an additional $250,000 for his work expediting zoning permits. [PSMF 28, 29; House Dep. 277].

At the time of the River Property purchase, House's real estate license was active and he was registered with a broker called ProStar Realty ("ProStar"). [House Dep. 245-246]. House admits that his broker refused to participate in the River Property transaction because the broker was concerned that Wicker was laundering money. [PSMF 25, 26; House Dep. 258].[5] TJH was paid separately

---

[5] Plaintiffs point to ProStar's reluctance to be involved, and House's willingness to go forward notwithstanding his broker's decision not to participate, as probative of House's improper motive and an intent to deceive.

and outside of the real estate closing after submitting a statement to Paramatma

outlining his "Administrative/Consulting Fee" in the amount of $1.5 million.

House denies having any knowledge prior to this litigation that Wicker was

overcharged for purchasing the River Property.

### 2. The Redding Property

Shortly after the River Property purchase, House identified a second

property for Wicker to invest in.  [PSMF 46; House Dep. 238, 324].  In or around

July 2014, Wicker purchased approximately 1,105 (+/-) acres in Forsyth County on

or near Mount Tabor Road (the "Redding Property").  [PSMF 30].  The actual

purchase price for the Redding Property was $22 million, but Wicker was invoiced

for or charged $36 million. [PSMF 31; House Dep. 323, 335].  There is conflicting

evidence regarding what was disclosed to Wicker about the purchase price.  [Defs.

Response to PSMF 31].[6]  Beria presented a "cost break down" on TJH letterhead

that stated the purchase price for the Redding Property was $36 million.  [PSMF

33].  Beria also emailed to a Wicker associate an "Escrow Agreement" stating that

the agreement is "for the remaining balance for land purchase in north Georgia."

---

[6] The Court takes judicial notice of Wicker's April 25, 2018 testimony in the New York action stating that the purchase price for the Redding Property was $22,000,000. [Dkt. 521-4].  See FED. R. CIV. P. 201(c)(1).

[PSMF 34].  The Escrow Agreement similarly stated that $2 million had already been received and the additional $34 million was "to cover the balance of the purchase price and closing costs."  [PSMF 35].

In addition, LSC1 (Beria) submitted a separate commission statement for an additional $1.98 million, once again misrepresenting that the purchase price was $36 million.  [PSMF 36].  This commission statement is purportedly signed by House.  House testified that he did not sign the document.  Beria claims he was authorized to sign House's name, which House disputes.   [PSMF 37; House Dep. 108, 110-11; Beria Dep. 206-207].

In the end, Wicker paid $36 million for the Redding Property.  [PSMF 39]. TJH (House) and LSC1 (Beria) split a fee of $3 million.  [House Dep. 271].  On or about July 1, 2014, $3 million was wired to TJH.  [PSMF 45].  House purported to document this payment on TJH letterhead as a $3 million dollar commission to TJH.  [PSMF 47].  TJH's commission statement refers to this as a "Real Estate Commission in the amount of $3,000,000.00 (Three Million Dollars) is due to TJH, Inc. upon closing of land sale in the amount of $22,000,000." [PSMF 48]. TJH received an additional payment in the amount of $500,000.  TJH's commission statement for this $500,000 describes, "Commissions earned upon

closings. To purchase land, and negotiate price [o]n behalf of Mr. Wicker."

[PSMF 49].  House denies preparing this document.

At least $10,520,700 was wired to LSC1 on or about July 3, 2014.  [PSMF 41, 42].  According to LSC1 (Beria), this money was received in connection with a Lot Development Agreement, which required use of the funds to pay for development.  [PSMF 43].

In addition to the Excess Redding Purchase Proceeds, LSC1 (Beria) induced Wicker into paying LSC1 (Beria) an additional $1.98 million as a real estate commission in August 2014. [PSMF 52].  Wicker paid the Redding Property Commission of $1,980,000 via wire transfer to LSC1 (Beria) in reliance upon a document on LSC1 letterhead, that LSC1 submitted (by fax), purportedly signed by House, entitled: "Building/Development & Consulting/Management services [sic]."  [PSMF 53].  House denies signing this document.  This document purported to reflect a payment due to LSC1 (Beria) as "Real Estate Commission of 5.5% in the amount of $1,980,000" and recited that "[t]he price of $36,000,0000 (Thirty six [sic] Million Dollars) has been agreed upon by Mr. Werner J. Wicker and does not cover all real [sic] Estate Commissions and Closing Costs."  [PSMF 54, 55].  Beria was not a licensed real estate agent or broker and was not entitled to

a commission arising out of Wicker's acquisition of the Redding Property.  [PSMF 56].

### 3.  Lot Development & Land Clearing Agreements

It is undisputed that $16,301,700 was diverted to LSC1 (Beria) out of the excess River & Redding Property funds and justified by LSC1 (Beria) as payment pursuant to a Lot Development Agreement ("LDA").  [PSMF 132-133].  In addition, the record reflects that Wicker funded an additional $20.7 million dollars in connection with two Land Clearing Agreements ("LCAs"). [PSMF 58].  The relevant LCAs were between Wicker and LSC1. [PSMF 59, 98].

On November 5, 2014, Beria sent an email to Wicker (through Tejinder Gudian) attaching a "Company Profile" which stated, among other things, LSC1(Beria) hired LoTi to develop the River and Redding Properties as reflected in the "Lot Development Agreement" and "Land Clearing Agreement" and that "[b]usiness is conducted at LSC1 with integrity, honesty, and best-in-class efficiency assuring our customers of timeliness and dependability."  [PSMF 60].  Beria assured Plaintiffs that he and LSC1 were skilled and experienced in commercial/residential land development, investment and investment management, and urban planning. [PSMF 61-62].  Beria, who asserted his Fifth Amendment

privilege when questioned on this topic, testified that he made these representations to convince Wicker to execute a LCA and send $11.7 million for the Redding Property.  [PSMF 63-66].

In turn, Wicker funded to LSC1 $11.7 million on or about December 2, 2014 under the auspices of the Redding LCA.[7]  [PSMF 67].  Beria falsified the LCA to make it look like it was only $7.25 million and sent that version to House.  [PSMF 68].  LSC1 (Beria) kept $4.45 million and wired the other $7.25 million to LoTi's account at Bank OZK, from which Beria and House each received $3 million. [PSMF 69].

A few weeks later, Beria was attempting to induce Wicker to immediately enter into, and fund, another LCA for the River Property for $9 million. [PSMF 72].  On January 17, 2015, Beria sent Wicker a letter, which purported to be from Edward Johnson, Jr., a senior administrator with the Army Corps of Engineers in order to make Wicker believe land clearing was urgently needed. [PSMF 73].  The letter Beria sent to Wicker from Johnson was a forgery. [PSMF 74, 75].

---

[7] The Court need not evaluate Defendants' MPSJ on this issue since it is beyond debate that genuine issues of material fact exist and preclude disposition as a matter of law on any single cause of action.

House drafted the River LCA scope of work (which was subsequently sent to Wicker for execution) with a provision stating that "[t]he above scope of work will bring this land up to date with all county and government standards, and therefore enhance the land value and simultaneously satisfy the county's and the United States Army Corp of Engineers Requests." [PSMF 76].  House testified that he had no recollection of speaking to the Army Corps of Engineers regarding the River Property, as his only meeting with the Corps pertained to the Redding Property and there is no evidence that there was any such request or requirement regarding the River Property.  [PSMF 77; House Dep. 309].

Following receipt of Beria's email with this letter and LCA, Wicker entered into the land-clearing contract and, on February 19, 2015, wired LSC1 (Beria) $9 million dollars using the wire instructions Beria provided. [PSMF 79, 80]

The River LCA was $9 million, which Wicker funded.  Beria falsified the LCA to make it look like it was only $4.25 million and that is the version Beria sent to House.  [PSMF 81].  Beria sent the forged River LCA for $4.25 million to House on February 3, 2015, before Wicker agreed upon a price or funded that LCA. [PSMF 82].  When Beria emailed the version to House on February 3, 2015, Beria warned House: "Please let this be our business ONLY." [PSMF 83].  House received $2 million out of the River LCA funds.  [PSMF 84].

House testified that they "stopped work" just a few months later in the spring of 2015 and never completed the scopes of work contemplated under the LCAs.  [PSMF 85; House Dep., pp. 292:14 – 293:4, 619:7-23]. House testified that no land clearing (or development work) was done on either property after Spring of 2015. [PSMF 86; House Depo., p. 619:7-23].  Wicker was led to believe that the work was ongoing in correspondence from Beria.  [PSMF 87-90].  Plaintiffs assert that House knowingly assisted Beria in misleading Wicker concerning the land clearing work.

### 4.  The Westminster Apartments

In June 2015 (*after* the formation of Wicker, LLC), Wicker funded Wicker, LLC's purchase of the Westminster Square Apartments in Marietta, Georgia ("Westminster Apartments").  [PSMF 101].  Wicker was induced to pay an additional $4,515,000 to LoTi, an entity that – unbeknownst to Wicker at the time – was owned by Beria and Tim House.  [PSMF 100, 102].  House challenges this factual assertion and claims that he informed Wicker in August 2014 that he held an ownership interest in LoTi. Beria admittedly did not disclose his ownership interest in LoTi and took elaborate steps (including creating a false LoTi email account, involving a third person as a signator on fraudulently created LoTi documents, and pretending to be Wicker's advocate and be negotiating in Wicker's

best interest to lower the LoTi payment due and to avoid or reduce the risk of future litigation) to hide his involvement and self-interest.  [PSMF 103-131]. House went along or agreed with Beria's suggestion that a third-party (Michael Wewers) be brought in to negotiate the LoTi commission with Wicker.  [PSMF 126].

Beria copied the actual closing statement for the Westminster Apartments purchase prepared by the closing attorney and used it to create a false closing statement (with the law firm's letterhead) requiring additional payment for "Referrals, Site Visits Real Estate Commission, Title Searches, Survey And Closing Coordination and Closing Transactions."  [PSMF 106-109].  Beria had the false closing statement sent to Wicker via email.  [PSMF 107].  When Wicker asked questions about the false closing statement and additional monies supposedly owed to LoTi, Beria justified the additional expenses and persuaded Wicker to pay LoTi the additional funds.[8]  [PSMF 110, 111].

Beria also subsequently misappropriated operating funds from the Westminster Apartments.  Beria's management (or mismanagement) of this

---

[8] This act marked the beginning of "the LoTi Fraud."

property and the defrauding of Wicker out of $4,515,000 million dollars led to a

criminal investigation and the federal prosecution of Beria.  [PSMF 104, 105].

House denies having any knowledge of the false closing statement Beria

presented to Wicker or Beria's misappropriation of operating funds.  House was

paid $2 million for finding the Westminster Apartments and presenting the

property as a potential investment. [House Dep. 382].  House's involvement after

locating the property was limited.  According to House, after finding the property

for Wicker, House provided minimal services and had no role in the management

of Westminster after October 2015.

Beria's criminal conviction (by Information) was not based on conduct

related to the other Properties or the allegations within Plaintiffs' SAC concerning

the House Defendants.  To date, House has not been prosecuted.[9]

**F.  Wicker, LLC**

In 2014, Wicker, LLC was formed based on the recommendation of

Paramatma for the stated purpose of holding title to Wicker's personal

investments.  Title to the Georgia properties were subsequently transferred from

---

[9] Attorney Nicholas A. Lotito, a criminal defense attorney that entered the case on behalf of the House Defendants in February 2020 [Dkt. 220], moved to withdraw from the case with consent in August 2020.  [Dkts. 324, 335 (Order permitting withdrawal)].

Wicker to Wicker, LLC.  Attorney Wendy W. Kraby, with Miles, Hansford & Tallant, LLC, Cumming, Georgia, was the attorney hired to handle the formation of Wicker, LLC.[10]

From the beginning of the case through July 2021, Paramatma claimed that Wicker assigned him a 50% membership interest in Wicker, LLC.  Wicker consistently asserted that he was the sole member of Wicker, LLC.  Wicker alleged that his signatures were forged on both the original Wicker, LLC Operating Agreement purporting to assign a 50% membership to Paramatma, and the 2017 Amended Operating Agreement, purporting to name Beria, through his entity LSC1, manager of Wicker, LLC.  Alternatively, Wicker argued that, even if Paramatma was found to be a member of the LLC, Paramatma had been validly expelled as a member.[11]

On March 11, 2020, Wicker, LLC was joined as an indispensable party and Plaintiff was permitted to amend the Complaint to encompass Wicker's claims as

---

[10] Attorney Kraby also represented the House Defendants and LoTi.

[11] The October 2019 Preliminary Injunction resulted in Wicker obtaining sole management authority of Wicker, LLC.  [Dkt. 146].  Paramatma was enjoined from interfering with the operation of the LLC and the receivership of the LLC was terminated. The Court's Preliminary Injunction was later vacated and remanded by the Eleventh Circuit.  [Dkt. 430].

well as claims of the LLC.  [Dkt. 231].[12]  On March 25, 2020, Plaintiffs filed their

SAC [Dkt. 238], the operative pleading.[13]

     After Wicker's passing, Paramatma asserted that he was the sole member

and 100% owner of Wicker LLC.  Paramatma moved for emergency relief seeking

to regain control and management of the LLC and asked that the Court bifurcate

the case to allow the LLC ownership question to be resolved before litigation of

the Wicker claims and Defendants' counterclaims proceeded.

---

[12] In July 2017, Wicker, LLC conveyed its ownership interest in the Westminster Apartments to SAKS Management and Associates, LLC. SAKS moved to join Wicker, LLC in this case after the LLC commenced two lawsuits in the Superior Court of Cobb County, Georgia, one of which sought to rescind conveyance of the Westminster Apartments to SAKS. [Dkt. 158, Dkt. 158-1 at 2, Exhibits 2-3].

[13] Many of Plaintiffs' causes of action are described in sub-parts. For instance, Count I alleging "Fraud and Conspiracy to Commit Fraud" has ten sub-parts, e.g., (A) thru (J), setting forth the conduct of Defendants (and groups of Defendants) that Plaintiffs contend constitute fraud and/or demonstrates that Defendants engaged in a conspiracy to commit fraud.  The House Defendants' Answer to the SAC [Dkt. 246] denies that House had knowledge or participated in any way in the conduct described in the SAC.  Defendants' Answer asserts multiple defenses to Plaintiffs' SAC but does not advance a Counterclaim.  The House Defendants assert theories of estoppel (reliance on the POA executed by Wicker and Paramatma's purported membership in Wicker, LLC), forgery, lack of privity, voluntariness of payment, and lack of injury given the claim that the House Defendants' actions enhanced the value of the real properties.  The Court has attempted to address the issues most likely to be presented at trial in the instant Order.

The Wicker, LLC ownership issues have since been resolved.  Plaintiffs reached an agreement with Paramatma and SAKS, which rendered Paramatma's emergency motions moot.

### G. July 2021 Consent Order

On July 21, 2021, a Consent Order executed by Plaintiffs, Paramatma, and SAKS was entered by the Court declaring that the Wicker Estate "is the sole owner and member of Wicker, LLC, and that the Estate has the sole right and authority to vote the membership interests and to manage Wicker, LLC. Paramatma does not have any rights, claim or interest whatsoever in Wicker, LLC, the River Property, the Redding Property and/or Westminster Apartments." [Dkt. 460, ¶ 1].  In addition, the Consent Order vacated the injunctions prohibiting the sale of any of Wicker, LLC's property without prior approval of the Court and prohibiting SAKS from selling, conveying and/or encumbering the Westminster Apartments.  [Dkt. 460, ¶¶ 2-3].  On July 26, 2021, Defendants Paramatma, SAKS, and Rawla were dismissed from the case, along with Paramatma's counterclaims against Plaintiffs. [Dkt. 463].

### H. Documents Executed by Paramatma on Behalf of Plaintiffs & Impact of Paramatma Settlement

Paramatma executed documents on behalf of Wicker (as authorized by the POA) and also on behalf of Wicker, LLC (as a purported 50% member) that, on

the face, approved payments to the House Defendants and/or were meant to authorize House's conduct and work performed in connection with the Properties. Thus, Paramatma's role in the alleged fraud has some bearing upon Plaintiffs' claims against the House Defendants.

The Court is not privy to the agreement struck between Plaintiffs and Paramatma that resulted in Paramatma's dismissal and the withdrawal of his claim that he possessed a membership interest in Wicker, LLC. In other words, the record does not reflect whether Paramatma admitted to any wrongdoing or malfeasance or conceded his role in the alleged fraud. Paramatma was never deposed in this case.[14]

And, as noted *supra*, Beria – House's business partner -- pled guilty to wire fraud and then defaulted as to liability on all of Plaintiffs' claims against him.

---

[14] The docket reflects that Paramatma's deposition was noticed eight (8) different times by Plaintiffs. The Eighth Notice of Deposition called for Paramatma to be deposed by videoconference on July 22 and July 23, 2021. [Dkt. 446]. The Consent Order was filed July 21, 2021.

Like Wicker, Paramatma was deposed in another civil action (the New York litigation styled, Abraham, Sanjana Jon vs. Paramatma, Prabhu). Plaintiffs rely on portions of Paramatma's testimony in that case to support their contention that House held himself out as a real estate broker (as did Beria). [March 27, 2019 Deposition of Prabhu Paramatma ("Paramatma Dep."), Vol. II, 135-136].

The question for the Court is where these developments leave Tim House and TJH.

## STANDARD

The standard for summary judgment is well-established. Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." BBX Capital v. Fed. Deposit Ins. Corp., 956 F.3d 1304, 1314 (11th Cir. 2020) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute over such a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

At summary judgment, the Court's function is not "to weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." Sears v. Roberts, 922 F.3d 1199, 1205 (11th Cir. 2019) (citing Anderson, 477 U.S. at 249).  Accordingly, the Court must "consider the record and draw all reasonable inferences in the light most favorable to the non-moving party." Blue v. Lopez, 901 F.3d 1352, 1357 (11th Cir. 2018).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party moves for summary

judgment.  Rather, in this context, Rule 56 "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."  Yager v. Lockheed Martin Corp., 2016 WL 319858, at *3 (N.D. Ga. January 26, 2016) (citation and internal quotation marks omitted); and see Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004) ("Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.") (citation omitted). Lastly, the filing of cross-motions for summary judgment "does not give rise to any presumption that no genuine issues of material fact exist."  3D Medical Imaging Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017); and see Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal quotations omitted).

The Court now applies the standard outlined above to each party's motion.

# DISCUSSION

## I. Preliminary Considerations

## A. Defendants' Failure to Comply with LR 56.1, NDGA

Plaintiffs ask the Court to deem their Statement of Material Facts ("PSMF") [Dkt. 500-1] admitted given the House Defendants' failure to comply with LR 56.1 in both their responses and briefing in opposition. [Dkt. 525 at 3-5].

Under the Local Rules, the Court will not consider any fact: (a) not supported by any citation to evidence (including page or paragraph number).  LR 56.1(B)(1) and (B)(2)(b).  In Defendants' Response to PSMF [Dkt. 527-7 – (Defs. Resp. to PSMF")], numerous answers/responses state generally that Defendants "have no personal knowledge of this statement"[15] or that the fact is "disputed" or "disputed as stated."  Defendants' Response to PSMF also fails for the most part to include citations to evidence when attempting to refute Plaintiffs' fact statements. Examples of these deficiencies are found in Defendants' Responses to PSMF 14, 19, 21, and 22.  The same is true for portions of Defendants' Memorandum in Opposition [Dkt. 521], which also runs afoul of LR 56.1(B)(1)(d) ("the Court will

---

[15] Pursuant to LR 56.1(B)(2)(a)(4), "The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of FED. CIV. P. 56(d)."

not consider any fact . . . (d) set out only in the brief and not in the movant's

statement of undisputed facts").

Local Rule 56.1B(2) governs the obligations of a party opposing summary

judgment (or respondent) and provides in pertinent part:

> This Court will deem each of the movant's facts as admitted
> unless the respondent:  (i) directly refutes the movant's fact
> with concise responses supported by specific citations to
> evidence . . .; (ii) states a valid objection to the admissibility of
> the movant's fact; or (iii) points out that the movant's citation
> does not support the movant's fact or that the movant's fact is
> material or otherwise has failed to comply with the provisions
> set out in LR 56.1 B.(1).

L.R. 56.1B(2)(a)(2); see also Thyssen Elevator Co. v. Drayton-Bryan Co., 106 F.

Supp. 2d 1342, 1345 n.1 (S.D. Ga. 2000) ("Unrebutted, evidentially supported Fact

Statements are deemed admitted under S.D.Ga. Local Rule 56.1 and Dunlap v.

Transamerica Occidental Life Ins. Co., 858 F.2d 629, 632 (11th Cir. 1988).").

Defendants' responses are not supported by specific citations of evidence.  Where

the Court finds that Plaintiffs' fact statements are unrebutted and supported by the

evidence presented, the statements are deemed admitted.

### B. Plaintiffs' Motion to Strike or Disregard New Arguments and Evidence in House Defendants' Reply [Dkt. 527]

Plaintiffs ask the Court to strike the House Defendants' Reply brief as

exceeding the scope of their MPSJ, to disregard new evidence or argument

contained within Defendants' Reply, or, alternatively, to grant Plaintiffs leave to submit a Sur-reply. [Dkt. 527]. Defendants oppose Plaintiffs' Motion to Strike but do not oppose Plaintiffs' alternative request to file a Sur-reply. [Dkt. 529].

### 1. Scope of Defendants' MPSJ

According to Plaintiffs, Defendants' Reply identifies additional causes of action warranting summary judgment in their favor and advances new legal arguments and even new evidence not raised or relied upon in their initial brief.[16] For instance, initially, the House Defendants state they are seeking summary judgment on the following causes of action in Plaintiffs' SAC: Counts III, IV (parts), V, VI, plus certain parts of Count I and II. In contrast, in their Reply, the House Defendants summarily claim they are entitled to summary judgment as to Counts I – VIII since they are all "fraud-based claims." [Dkt. 522 at 9]. To clarify, Defendants' Reply does not include any substantive discussion of Count VIII and appears to group the state and federal RICO claims. Still, as revealed by their original MPSJ and accompanying memorandum of law, the House Defendants did not move for summary judgment on Count VIII (alleging unjust enrichment or money had and received) or Count VII (alleging violation of the Georgia RICO

---

[16] In terms of new evidence, Plaintiffs point to the March 29, 2022 Declaration of Tim House ("House Decl."), which is discussed below. [Dkt. 527 at 3-4].

statute).  The Court limits its analysis to the causes of action identified in Defendants' MPSJ and initial brief.

### 2.  House March 2022 Declaration

The House Defendants have also filed a sworn Declaration by Tim House dated March 29, 2022, which is offered both in opposition to Plaintiffs' MPSJ [Dkt. 521-1] and in support of the House Defendants' MPSJ [Dkt. 522-1].

Plaintiffs argue that the House Declaration violates Rule 6(c)(2) of the Federal Rules of Civil Procedure, requiring that affidavits supporting a motion be served with the motion, as well as LR 7.1A(1), NDGA. Plaintiffs object to the Court's consideration of the Declaration to the extent House "is trying to concoct a fact dispute that does not exist."[17]  [Dkt. 525 at 3]. Plaintiffs forcefully oppose House's sworn statement that he never concealed his participation in LoTi from anyone. [Dkt. 519 at 27-28].  Plaintiffs argue that "[m]ore fraud" should not be allowed to defeat their motion.  [Dkt. 525 at 3].

Among other things, the House Declaration addresses Plaintiffs' MPSJ seeking judgment as a matter of law that the payments to House and TJH were

---

[17] Plaintiffs point to "testimony and argument regarding alleged 'work' relating to the Forsyth Properties (House Decl., ¶¶ 10-15), alleged 'eccentricity' of Mr. Wicker (¶¶ 16-20), and alleged work in connection with Westminster commission (the Loti Fraud) despite being told Wicker did not want him involved (¶¶ 21-22)." [Dkt. 525 at 3].

"illegal real estate commissions" and the underlying agreements unenforceable. [Defs. Resp. to PSMF 23].  House's Declaration introduces for the first time the argument that House was lawfully entitled to the payment of funds for services rendered because he was a mere "referral agent" and because he was not required to be a real estate "broker" (as opposed to a real estate salesperson) to receive payment.  [House Decl. ¶ 17 ("I was not paid as a realtor or broker in the subject transactions.")].  House represents that he was paid a consulting fee as opposed to real estate commissions.  [House Decl. ¶ 21].  This declaration is not necessarily contradictory in that House testified when deposed that he was a consultant and received a consulting fee.  [House Dep. 469].

"Generally, discrepancies between a witness's affidavit and deposition do not defeat the admissibility of the affidavit [or declaration], but instead go toward the credibility of the witness."  Poitevint v. United Recovery Sys., LP, 899 F. Supp. 2d 1230, 1235 (N.D. Fla. 2012) (citation omitted) (explaining "sham affidavit" rule).  "An affidavit [declaration] may only be disregarded as a sham 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact ... [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"  Tippens v. Celotex Corp.,

805 F.2d 949, 954 (11th Cir. 1986) (quoting Van T. Junkins and Assocs. v. U.S. Industries, 736 F.2d 657 (11th Cir. 1984)).

To the extent the House Declaration is "inherently inconsistent" with House's deposition testimony given in response to unambiguous questions, the Court does not consider it. Tippens, 805 F.2d at 954. However, where the Declaration elaborates or could be considered a clarification of his previous testimony, it is considered where expressly noted.[18]

More importantly, at trial, assuming House does not assert his Fifth Amendment privilege, Plaintiffs will have the opportunity to cross-examine House on any alleged inconsistency.  It is within the province of the jury to weigh House's credibility.  Id. at 953-54.

It is worth noting that the House Declaration is not determinative of any factual or legal issue raised within the parties' cross-motions.  As such, a Sur-reply is simply not necessary. As discussed below, given the Court's analysis regarding summary judgment, Plaintiffs' Motion to Strike [Dkt. 527] is largely moot.

---

[18] Plaintiffs concede that "some of the new Declaration purports to relate to documents filed with Plaintiffs' Response[.]" [Dkt. 527 at 4].

## II.    The Parties' Respective Motions for Partial Summary Judgment

### A. Plaintiffs' Contention that Payments to the House Defendants Constituted "Illegal Real Estate Commissions" and are Recoverable by Plaintiffs

Advancing multiple primary and alternative legal theories, Plaintiffs claim they are entitled to recover from House 100% of the purported real estate "commissions" paid by Plaintiffs to Beria, House, and LoTi in connection with the underlying real estate transactions.[19]  Plaintiffs' primary premise is that, setting the fraud-based claims aside, Plaintiffs are entitled to recover all monies paid to the House Defendants because the payments were prohibited by Georgia real estate law.  Alternatively, Plaintiffs seek an Order from the Court holding that certain of the agreements Defendants claim they relied upon (i.e., Consulting/Commission Agreements, LCAs) are unenforceable as a matter of law or subject to rescission on various grounds.

---

[19] The reality is that the House is the proverbial last man standing; Plaintiffs' last-ditch effort to recoup some of their losses.  Beria's plea agreement contemplated that he would be responsible for restitution in the amount of $1,621,979.00 and forfeit to the Government any property, real or personal/ constituting or derived from proceeds obtained, directly or indirectly, as a result of the offenses in the Information/ including/ but not limited to/proceeds in the form of a money judgment.  [Dkt. 5-1 – Plea Agreement, ¶¶ 20, 21].

As an initial matter, the Court addresses Plaintiffs' contention that the monies paid to House and TJH were illegal real estate commissions, subject to recovery by Plaintiffs.[20]  The undersigned will first discuss the relevant law.

## 1.  Applicable State Law

Georgia law prohibits persons who do not possess a broker's license from holding themselves out as a referral agent "for the purpose of securing [real property] prospects for the . . . sale[ or] purchase. . . ."  O.C.G.A. § 43–40–1(2)(B); Amend v. 485 Properties, LLC, 401 F.3d 1255, 1258 (11th Cir. 2005) (applying § 43–40–1 and stating that, "any person who negotiates or assists in procuring prospects for renting or leasing for any real estate or holds himself out as a referral agent for doing so, must obtain a license with the Georgia Real Estate Commission").  And persons without a broker's license who violate § 43-40-1 are barred from collecting fees.  O.C.G.A. § 43–40–24(a) provides,

> No person shall bring or maintain any action in the courts of this state
> for the collection of compensation for the performance of any of the
> acts mentioned in this chapter [Chapter 40] without alleging and

---

[20] Plaintiffs' MPSJ groups the claims against the House Defendants as falling into one or more of the following categories: (1) Illegal Real Estate Commissions in Connection with the River and Redding Purchases, as alleged within Counts I (B, D), II (B, D), III, IV, VIII, X, XII; (2) Illegal Real Estate Commissions in Connection with Westminster Apartments Purchase (via LoTi), as alleged within Counts I (H), II (G), III, IV, VIII, X, and XII; (3) Additional Claims for Real Estate Commissions Attempting to Sell Wicker's Property in 2018, as alleged in Count X.

> proving that he was a licensed broker in Georgia at the time the alleged
> cause of action arose.

Oconee Inv. Grp., LLC v. Turk, 807 S.E.2d 512, 513 (Ga. App. 2017) (summary

judgment reversed where factual question existed with respect to application of

referral fee exception).

"Georgia's regulation of brokers was enacted pursuant to its police power to

protect the public interest[.]" Amend, 401 F.3d at 1259; accord Mayo v. Lynes, 55

S.E.2d 174, 175 (Ga. App. 1949).[21]  For this reason, "an agreement to pay a

brokerage fee entered into with an unlicensed broker is void and unenforceable

under Georgia law."  Amend, 401 F.3d at 1259–60 (acknowledging potential for

severability of "[c]ontracts void as against public policy or merely legally

unenforceable") (citing, *inter alia*, O.C.G.A. § 13–1–8).[22]

---

[21] See § 18:64. Licensing of broker, 2 GA. REAL ESTATE LAW & PROCEDURE §
18:64 (7th ed.) ("Strict licensing and regulation of brokers has become necessary in
order to protect the public from unscrupulous practices and to inculcate
professional standards of conduct.") (citations omitted).

[22] O.C.G.A. § 13–1–8 provides:

> (a) A contract may be either entire or severable. In an entire contract,
> the whole contract stands or falls together. In a severable contract, the
> failure of a distinct part does not void the remainder.
> (b) The character of the contract in such case is determined by the
> intention of the parties.

As defined by statute, the term "[b]roker" means any person who, for

another, and who, for a fee, commission, or any other valuable consideration or

with the intent or expectation of receiving the same from another:

> (A) Negotiates or attempts to negotiate, or assists in procuring prospects for the . . . sale[ or] purchase[ of] real estate;
>
> (B) Holds himself . . . out as a referral agent for the purpose of securing prospects for the . . . sale[ or] purchase [of] . . . real estate; . . .
>
> (I) Provides or attempts to provide to any party to a real estate transaction consulting services designed to assist the party in the negotiations or procurement of prospects for the . . . sale[ or] purchase[ of] . . . real estate. . . .

O.C.G.A. § 43-40-1(2) (2003).

**2. Analysis**

**a. House Performed "Broker" Functions, as Defined by § 43-40-1(2), and Collected Fees Without a Broker's License**

According to Plaintiffs, the "commissions" (or monies) Plaintiffs paid to

House were "illegal," and therefore recoverable by Plaintiffs, because House is not

a licensed real estate broker as defined by the State of Georgia.  See Grant v. Elder,

245 S.E.2d 341, 342 (Ga. App. 1978); O.C.G.A. § 43-40-1(2).  Plaintiffs argue

that, notwithstanding the allegations of fraud as to the underlying transactions, the

Court should find, as a matter of law, that House is liable (along with Beria and

LoTi) for this reason alone.

### i. House Is Licensed as a "Salesperson"

House concedes that he is not a licensed real estate "broker" for purposes of § 43-40-1(2) but denies that the services provided fall within the statutory definition of "brokerage" services. [Deposition of Timothy J. House ("House Dep.") at 114, 248-49, 258]. Instead, House is a licensed "salesperson" as defined by Georgia law. O.C.G.A. § 43-40-1(10) (defining "salesperson"). [Dkt. 521-1, ¶ 2]. "Salesperson" is defined as "any person, other than an associate broker, who acts on behalf of a real estate broker in performing any act authorized by this chapter to be performed by the broker." § 43-40-1 (10). The distinction matters. Though a salesperson may perform broker-type tasks, the participation of a licensed broker is required by law, and violation of the statute is sanctionable.

While House had a Georgia real estate license (a salesperson's license), he allowed it to lapse more than once. House testified and declared that this was intentional on his part; that he typically provided consulting or referral services as opposed to the more traditional listing and selling properties. [House Dep. 63; House Decl. ¶ 2]. House represents that he was frequently paid as a "consultant" for his services and emphasizes that his payment from Plaintiffs was always an "Administrative/Consulting Fee."[23] He argues that he was never paid as a broker

---

[23] The fee was to compensate House and TJH for the following services:

and that his fees were never a percentage of a sales price (typically how a broker would be compensated in a brokerage agreement).  That House and TJH did not label payments received from Plaintiffs as real estate commissions is not dispositive of the character of the services being provided.[24]  See O.C.G.A. § 43-40-1(2) (by definition, describing a broker's compensation as "a fee, commission, or any other valuable consideration").  Similarly, the mechanism for payment (i.e., outside of the real estate closing) or the fact that the contract specified that only the seller was paying a broker does not end the matter.  Unifund Gen., Inc. v. Orr, 383 S.E.2d 199, 201 (Ga. App. 1989) ("The fact that the contract specified that none of

---

Furnish referral and other documents as requested, site visits to property and buildings, introduction to numerous real estate agents representing various project types throughout Atlanta Metro areas, interview, coordination and introduction to attorneys, real estate agents/companies, title companies, providing materials to and bidding insurance quotes, pay fees, referrals, taxes and other costs associated with the referral agreement.

[24] There are also documents prepared and executed by Paramatma describing payment to LSC1 and LoTi as "real estate commissions."

Plaintiffs highlight that, in House's lawsuit against his CPA, John Carroll, House alleged that, "Beginning in 2014, Mr. House and TJH earned significant commissions from real estate sales that they helped to facilitate." (Complaint, ¶ 8, State Court of Forsyth County, Case No. 18SC-1024-A).  [PSMF 57].

the parties was acting as a real estate broker makes no difference"); and see Everett v. Goodloe, 602 S.E.2d 284, 289 (Ga. App. 2004) (citation omitted).

### ii. Consulting Amounts to "Broker" Activity

Plaintiffs correctly point out that providing "consulting services designed to assist [a party to a real estate transaction] in the negotiations or procurement of prospects" for the purchase of real estate is, by statute, prescribed broker conduct. § 43-40-1(2)(I) ("Provides or attempts to provide to any party to a real estate transaction consulting services designed to assist the party in the negotiations or procurement of prospects for the . . . sale[ or] purchase[ of] . . . real estate").  The statutory definition of broker was amended, effective July 1995, and expanded to encompass consulting services.[25]  Thus, in the real estate arena, consulting services fall squarely within the definition of broker activity and require a broker's license. Id.

Viewing the evidence in the light most favorable to House, the Court finds that no reasonable jury could conclude that the services House provided, namely, identifying potential investment properties for purchase and providing related

---

[25] § 18:64. Licensing of broker, 2 GA. REAL ESTATE LAW & PROCEDURE) (citations omitted).

"consulting," did not constitute "broker-type" activities.[26]  House himself

distinguished his consulting or referral services from the work of a traditional real

estate salesperson and the traditional listing and selling of real property.  [House

Dep. 63; House Decl. ¶ 2].  House explicitly states that he helped locate and

identify investment opportunities for real estate investors and, in opposing

Plaintiffs' MPSJ, House succinctly states that a real estate license was not required.

[Dkt. 521 at 6 (citing House Dep. 63; House Decl. ¶ 2)].  And he summarily posits

that this work did not constitute procuring potential real estate prospects for

purchase.  Why not?  House's mere assertions are insufficient to rebut the evidence

presented.  Even so, finding that House acted as a broker does not resolve the

matter.

   **b.  The Record Is Unclear Regarding Plaintiffs' Knowledge of House's
      Broker Status**

   According to Plaintiffs, any real estate commission paid to the House

Defendants, *while Plaintiffs were not aware that House did not have a broker's*

*license*, are recoverable because an agreement to pay a brokerage fee entered into

---

[26] See § 18:63. Definition and relation of broker, 2 GA. REAL ESTATE LAW &
PROCEDURE § 18:63 (7th ed.) (citations omitted) ("Persons who procure the
purchase or sale of land, acting as intermediary between the buyer and the seller,
are known as real estate brokers.")

with an unlicensed broker is "void and unenforceable under Georgia law." <u>Amend</u>,

401 F.3d at 1258-59.  Presuming that any fee paid to the House Defendants for

broker-type activities could be deemed a brokerage fee even if paid outside of

closing (which Defendants dispute), the Court next considers whether Plaintiffs

(Wicker) knew that House was not a broker.

As noted, Wicker was never deposed in this case.  In 2019, Wicker did,

however, provide testimony in another action acknowledging that Tim House was

"the agent" or "the real estate agent" for his first two Georgia real estate purchases

(River & Redding Properties).  [Dkt. 521-4].  When asked how he knew Beria,

Wicker testified that he knew Beria:

> [t]hrough Mr. Paramatma and he was there when we viewed the
> properties in Georgia, but he was not involved because both properties
> that were not developed were managed by Tim House who was the real
> estate agent and Tim House did all these correspondences with me and
> Mr. Paramatma and Mr. Beria were present. And so Mr. Beria was
> someone who kind of just came along because the real estate agent was
> Tim House.

[April 29, 2019 Deposition of Werner J. Wicker ("Wicker Dep."), Vol. II].[27]

---

[27] Assuming this evidence would be admissible at trial, the probative value of
Wicker's testimony, which was unchallenged by any House representative (not
subject to cross-examination by attorneys representing the House Defendants), is
likely limited.

Wicker's testimony tends to show that Wicker understood House to be a "real estate agent," presumably with some sanctioned license. However, there is no evidence that Wicker was informed that House was or was not a licensed broker as defined by Georgia law. See, e.g., Grant, 245 S.E.2d at 342 (trial court erred in holding that plaintiff "had no knowledge" that defendant was not licensed in this state to sell real estate and in granting partial summary judgment as to liability; and finding that whether plaintiff had knowledge or not was a genuine issue of material fact).

In addition, regarding Plaintiffs' business within the State of Georgia and purchasing the subject Properties, it is well established that Wicker relied heavily (almost exclusively) on Paramatma. Paramatma, like Wicker, was deposed in the civil action brought against him by Abraham. Paramatma testified that he traveled to Georgia to meet with Beria on numerous occasions and that he met with Beria and House. Paramatma was asked about House and testified as follows:

Q. Who is House?

A. Tim House is a real estate agent.

Q. He is a licensed real estate broker as far as you knew?

. . .

A. He told me.

Q. Did he have a company name?

A. I mean, he was presenting him as a real estate broker, yeah.

> Q. Who was presenting him as a real estate broker, Mr. Beria or Mr. House or both?
>
> A. Both.
>
> Q. So Mr. House was a real estate broker.  Was he also a contractor of some sort?
>
> A. Yes.

[Dkt. 525-2].

Plaintiffs present sufficient evidence from which a jury could reasonably infer that House held himself out to both Wicker and Paramatma as a licensed real estate broker capable of lawfully representing Wicker's interests and his wish to invest in properties in Georgia.  Even so, the evidence is inconclusive concerning what Wicker knew or did not know concerning House's broker licensure status.

Viewing the evidence in the light most favorable to the House Defendants, the record does not make clear -- and the Court is unable to find as a matter of law -- that Plaintiffs (Wicker) were unaware that House was not a real estate broker during the relevant time-period.  As such, on this record, the Court is unable to determine that the agreements authorizing payment to the House Defendants for the identifying the Properties are unenforceable as a matter of law.

### c. Genuine Issues of Material Fact Exist Concerning Application of the Referral Agent Exception, O.C.G.A. § 43-40-29(a)(9)

House also contends (belatedly) that a statutory "referral fee" exception

defeats Plaintiffs' "illegal real estate commissions" argument. [Dkt. 521 at 5].

House relies on O.C.G.A. § 43-40-29(a)(9), which reads in pertinent part that the

following is excepted from standards for fees established by the Georgia Real

Estate Commisson:

> (9) Any person acting as a referral agent *who is not involved in the actual negotiations*, execution of documents, collection of rent, management of property, *or other related activity which involves more than the mere referral of one person to another* and who:
>
> (A) Does not receive a fee for such referral from the party being referred;
> (B) Does not charge an advance fee; and
> (C) Does not act as a referral agent in more than three transactions per year.

§ 43-40-29(a)(9) (emphases supplied).

### i. Did House's Services Go Beyond a Referral on One or More of the Relevant Purchase Transactions?

If applicable, the referral agent exception presents additional questions of

fact.  Here, there is evidence from which a jury could reasonably find that House

engaged in negotiations and did more than simply refer a property to Plaintiffs.

When deposed, House testified that he negotiated on Wicker's behalf in connection

with the real estate purchases and that Beria was not involved in negotiating the

purchases.   [House Dep. 269-270, 276, 281].  House later tried to minimize his

role as a negotiator by stating that the seller of the River Property Freddie Deutsch

was not open to negotiations and pretty much set the price based on what the bank

had in the property.  [House Dep., Vol. II, 269].  House then testified that the

closing attorneys for Plaintiffs and the seller negotiated the terms and purchase of

the Redding Property.  Yet, TJH's commission statement for a related $500,000

payment (beyond the supposed referral agent fee) describes, "Commissions earned

upon closings. To purchase land, ***and negotiate price [o]n behalf of Mr. Wicker***."

[PSMF 51].

Concerning House's efforts regarding the Westminster Apartments

purchase, LoTi's July 8, 2015 Cost Analysis describes LoTi's (TJH/House)

involvement as "consulting and management" -- far beyond a referral.  [Dkt. 520-9

(Exh. 188) – LoTi Westminster Apartments Cost Analysis July 8, 2015

("Westminster Cost Analysis")].[28]  In addition, the Westminster Cost Analysis

represents that LoTi had previous dealings with Jim Hazelwood, an affiliate of the

seller's listing firm, and contacted Hazelwood to assist in LoTi's pursuit of the

property.  [Id. at 2].  In summarizing its contributions and basis for payment, LoTi

---

[28] This email was also sent from the LoTi email address rather than directly from
TJH (House) or LSC1 (Beria).

stated that the activities undertaken *exceeded* the scope of the Consulting / Management Agreement authorized by Paramatma. Specifically, LoTi stayed "in constant contact with LSC1, Phil Beggs [closing attorney], Jim Hazelwood [affiliate of seller's agent], and the current management company during the course of the negotiation and sale," that "LoTi attended meetings, [and] performed on site visits and inspections[,]" and that "LoTi performed many tasks and assignments that were asked by any and all participants in the transaction beyond the scope of the consulting / management agreement." [Id. at 3]. With respect to the Westminster Apartments transaction, a jury could reasonably find that LoTi was more akin to an intermediary between seller and buyer than a referral agent. This is likely Plaintiffs' strongest "illegal real estate commission" claim.

The extent of House's involvement, and whether the activities and services performed in connection with each transaction are sufficient to preclude application of the referral agent exception, is a jury question.

### ii. Is a Licensed Real Estate Salesperson Whose License is Inactive Able to Receive a Fee as a Referral Agent?

Moreover, Plaintiffs refer the Court to § 43-40-29(c), which expressly states that "[t]he exceptions provided by subsection (a) . . . [, i.e., referral agent exception,] shall not apply to any person who holds a real estate license." As previously noted, House possessed a Georgia real estate license (salesperson or

sales agent) but did not maintain an "active" status at all times.[29]  [House Decl.,

Attachment 1].  Whether the active or inactive status affects the analysis

concerning § 43-40-29(a)(9) eligibility is not clear, and the Court has not been able

to locate any legal authority speaking to this discrete issue.[30]  And, it seems that to

construe the statutory exception within Subsection (a)(9) to allow for a work-

around to obtaining a broker's license under such circumstances would be contrary

to legislative intent and the objectives of the statutory scheme, enacted as a

measure to protect the public and implement standards of professional conduct.

    Nonetheless, since House's evidence establishes that his license was active

when the Redding Property and Westminster Apartments were purchased, the

referral agent exception would not apply or offer House potential reprieve as to

---

[29] According to the House Declaration, House's Georgia salesperson's license was inactive at the time of the River Property transaction (on May 16, 2014), but active for both the Redding Property (July 2014) and Westminster Apartments purchases (June 2015).  [House Decl., Attachment 1 (reflecting SLPS license as "Inactive" from 5/13/14 through 5/19/14 and "Active" between 5/19/14 through 4/7/15 and then with a different broker but still "Active" from 4/7/15 through 6/28/17)].

[30] Arguably, application of Subsection § 43-40-29(a)(9) depends upon how the phrase "any person who holds a real estate license" within Subsection (c) is construed.  If "any person who holds a real estate license" is construed to encompass persons who hold either an active or inactive real estate license, House is excluded and unable to rely on the referral agent exception altogether. This is the position taken by Plaintiffs.  House has not identified any case law to support his position that an inactive real estate license makes him eligible to take advantage of the referral agent exception.

either of these transactions.  This means that, in order to uphold the written

agreements authorizing payment to House and/or LoTi, would require proof that

Plaintiffs were, in fact, aware that House was not a licensed broker at the time.

Amend, 401 F.3d at 1258-59.

In the House Defendants' Response to Plaintiffs' MPSJ, Defendants explain

that they were paid outside of the real estate closing (as a necessity) to

accommodate Wicker's agreement "to pay House a fee for locating and referring

investment properties to Wicker." [Dkt. 521 at 9-10]. The Agreement for the

Purchase and Sale of Real Estate ("River Property PSA"), which Paramatma

executed on Wicker's behalf, made clear that "Purchaser [Wicker] shall have no

responsibility for payment of a commission to any broker."  [Dkt. 501-7 – River

Property PSA, 13].[31]  House claims that this was always the way the transaction

was contemplated and that ProStar was never supposed to receive a broker's fee

from Wicker, which Plaintiffs suggest is disingenuous given that a Brokerage

Agreement was prepared and signed prior to ProStar backing out.

---

[31] If Wicker personally executed the PSA, a jury could reasonably infer from this
language that Wicker may have known that House was not a broker.  However,
Paramatma signed the PSA pursuant to the POA.

At minimum, genuine issues of material fact exist as to the extent of House's involvement with each transaction as well as the nature and characterization of the payments to the House Defendants [and/or LoTi]. The facts in Oconee provide an example of how the referral agent exception in § 43–40–29(a)(9) is to be applied.[32] Specifically, the court observed that plaintiff was offered a referral fee to locate a bona fide buyer, which she did; that the sale to the same buyer referred by plaintiff, in fact, closed, and that was the extent of plaintiff's involvement. The court explained that, "[b]ecause the evidence raises a question of fact as to whether [plaintiff's] activities fell within the exception in O.C.G.A. § 43–40–29(a)(9), [the moving defendant] was not entitled to summary judgment." Oconee, 807 S.E.2d at 514.

---

[32] In Oconee, plaintiff's evidence was that defendant-seller "expressly offered her [a] referral fee" in exchange for referring a bona fide buyer for a trailer park at a set price per lot. The prospective purchaser plaintiff referred signed a contract and closed on the sale of the properties. Viewing plaintiff's testimony in her favor, the court explained that a jury could find that plaintiff was "acting as a referral agent who is not involved in the actual negotiations, execution of documents, collection of rent, management of property, or other related activity which involves more than the mere referral of one person to another[,]" § 43-40-29(a)(9), where there was no evidence that plaintiff received a fee for such referral from the buyer (the party being referred) and no evidence that plaintiff charged an advance fee from the defendant-seller, id. § 43–40–29(a)(9)(A) and (B). There was also no evidence plaintiff acted as a referral agent in other transactions. Id. § 43–40–29(a)(9)(C).

Defendants also argue that, in Oconee, payment had not been made and, therefore, the posture of the case as well as the nature of the relief sought, render that decision inapposite. To that point, Defendants contend that the voluntary payment doctrine has application here as well.  See O.C.G.A. § 13–1–13; and see Kuchenmeister v. HealthPort Techs., LLC, 309 F. Supp. 3d 1342, 1347 (N.D. Ga. 2018) ("The voluntary payments doctrine provides that when a payment is made 'where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practices used by the other party,' payments are deemed voluntary and cannot be recovered by the payor.") (citations omitted). Given that Plaintiffs assert claims of fraud and breach of fiduciary duty and because the record does not establish conclusively whether all of the facts were known or duties breached concerning any particular event or transaction application, of the voluntary payment doctrine also presents a jury question.

As set forth, numerous questions of fact preclude any legal ruling by the Court that necessarily depends upon Plaintiffs' knowledge or lack thereof.  And, as explained supra, determining whether the agreements between the House Defendants and Wicker and Wicker's request that House locate and identify investment properties for purchase are void as against public policy and unenforceable as a matter of law depends upon Wicker's knowledge.  A jury will

47

be tasked with determining what Plaintiffs (Wicker) knew or did not know, whether and to what extent Plaintiffs were misled by House, and whether and to what extent House may have misplaced Plaintiffs' confidences and the like.  The jury will properly evaluate credibility and weigh the evidence.  Given the fact-specific nature of the underlying events, as well as Plaintiffs' claims, summary judgment is inappropriate.

Plaintiffs' alternative position is that they are entitled to partial summary judgment (and the same relief) on their causes of action alleging fraud, breach of fiduciary duty, and declaratory judgment. It is no surprise this is Plaintiffs' fallback position given that numerous questions of fact also preclude summary judgment disposition on these claims.

### B. The Parties' Respective Claims & Defenses Regarding Fraud & Breach of Fiduciary Duty (Aiding & Abetting) as a Basis for Declaratory Judgment and Disgorgement or Rescission Present Numerous Triable Issues[33]

Next, the Court addresses the parties' respective MPSJ, beginning with Plaintiffs' arguments concerning claims alleging fraud and/or breaches of fiduciary

---

[33] Plaintiffs and Defendants move for partial summary judgment on parts of Counts I and II, and Counts III, IV.

duty, which seek the same relief – to recoup monies paid to the House Defendants and LoTi.

More specifically, Plaintiffs suggest House knowingly worked with Paramatma and Beria to facilitate the alleged fraud pursuant to "sham" agreements and concealed the existence of these agreements in violation of their duties of disclosure.  Plaintiffs point to several documents executed by Paramatma on behalf of Wicker, LLC and contend that, like Beria, House was aware that Paramatma was not a member of the LLC and lacked the authority to enter into any agreement on the LLC's behalf.[34]  [Dkt. 525-4 -- Pls. Resp. to Defs. SAMF 6, 7].

---

[34] Plaintiffs point to three documents executed by Paramatma as an alleged member of Wicker, LLC when he, in fact, had no membership interest in the LLC:

(1)  On February 1, 2018, LSC1 entered into a Consulting Agreement with Wicker, LLC ("Consulting Agreement") entitling LSC1 to receipt of 10% of any purchase price of any sale of either of the Forsyth County Properties from any "prospect" introduced by LSC1;

(2)  On February 1, 2018, LSC1 entered into a Property Management Agreement with Wicker, LLC relating to the Forsyth County Properties ("Property Management Agreement") and providing that LSC1 would receive $20,000 per month and 10% of any sales of property owned by the LLC;

(3)  On September 21, 2018, TJH entered into a "Consulting Fee Agreement" with Wicker, LLC providing for a $3 million fee to TJH and LSC1 ("2018 Consulting Agreement").

Of particular import here is the 2018 Consulting Agreement entered into between TJH and Wicker, LLC on September 21, 2018 providing for a $3 million dollar fee to TJH and LSC1.  In his defense, House contends that he was entitled to rely on the authority granted to Paramatma via the Wicker POA and emphasizes that the Wicker POA was executed before House ever met Wicker or Paramatma. [Dkt. 522 at 4].

The obvious difficulty is that Plaintiffs bear the burden of establishing by a preponderance of the evidence House's knowledge and intent to defraud Plaintiffs.[35]  The same is true where Plaintiffs seek to hold House equally responsible (jointly liable) for Beria's actions as the sole owner of a member with a 50-percent interest in LoTi, an LLC.  It is also undisputed that, if Plaintiffs' theory of the case is accurate – that House did not have clean hands and was, in fact, a co-conspirator of Paramatma and/or Beria -- Beria was simultaneously defrauding ("double crossing") House.

1. **LoTi as a Means of Perpetrating Fraud – Plaintiffs and Defendants Both Move for Partial Summary Judgment (Counts I, II)**

Plaintiffs' LoTi Fraud claims, which the undersigned will not attempt to detail, touch upon all three real estate transactions and, as alleged by Plaintiffs,

---

[35] [See, e.g., Exhibits 2, 3, 17, 161 at 93, 164, 167, 169-173, 175; House Dep. 155, 159-60, 188, 309, 619].

implicate Paramatma and Beria, LSC1, as well as the House Defendants.  See SAC at 71-72, Count I, H -- "The LoTi Fraud (Against Paramatma, Beria, LSC1, House and LoTi").  Plaintiffs also contend that LoTi was a vehicle for breaching fiduciary duties owed to Plaintiffs and require disgorgement of payments to the House Defendants and/or rescission of all previous agreements, *see supra*.

According to Plaintiffs, House and Beria concealed their ownership of LoTi and used LoTi as another means of defrauding Wicker.  Concerning the LoTi Fraud, the gravamen of Defendants' MPSJ is that Plaintiffs are unable to establish that House acted with the requisite scienter or an intent to deceive and that, at best, the evidence supports that House was negligent.  Plaintiffs tell a different story and represent that House has already admitted the fraud; that House admitted in deposition testimony to concealing his identity and participation in LoTi.  While there is record evidence from which a jury could reasonably infer and find that House was a willing participant in at least parts of the fraud being perpetrated by Beria (and possibly others), in many instances, Plaintiffs overreach in terms of what House actually admitted.[36]

Under Georgia law, fraud requires proof of the following elements: (1) a false representation made by the defendant; (2) scienter; (3) an intention to induce

---

[36] To be clear, this is true with or without the House Declaration.

the plaintiff to act or refrain from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff.  <u>Kilroy v. Alpharetta Fitness, Inc.</u>, 671 S.E.2d 312, 313-314 (Ga. App. 2008) (citation omitted).

While it cannot be denied that false representations were made to Plaintiffs by one or more of the defendants named in the SAC, House claims that he personally never made any misrepresentations to Wicker and likewise never attempted to conceal anything.  [House Dep. 25, 513].  Although Plaintiffs challenge House's statement, viewing the evidence in the light most favorable to the House Defendants, there is no direct evidence to rebut House's assertion that Wicker was informed of House's involvement and interest in LoTi.  Moreover, the record supports House's contention that his interactions with Wicker were relatively limited in that House only met with Wicker in person on two occasions between the Spring of 2014 and August 2014, and House's other communications to Wicker were relayed through Paramatma. [House Dep. 25, 156].

House was aware that Paramatma was appointed as Wicker's POA and testified that he was instructed by Wicker to communicate with Wicker through Paramatma. [House Dep. 51, 52, 56, 364].  According to House, all communication with Wicker after August 2014 (and prior to commencement of litigation) went through Paramatma. [House Dep. 377].

House testified emphatically that he was not aware of Beria's statements and representations to Wicker. [House Dep. 43, 322 ("I didn't know what my business partner was doing or saying to anybody.")].  According to House, only Paramatma and Beria communicated directly with Wicker.  House testified that his job was to work on the Properties and that Beria's job was to communicate with the investor, who was Wicker.  [House Dep. 97].  Beria's testimony corroborates House's representation that communications to Wicker were channeled through Paramatma. Beria testified that he followed Paramatma's instructions when he needed a signature or needed to reach Wicker and was frequently directed to communicate or send documents to Wicker associates (e.g., Wicker's New York Attorney Daniel Weglarz).  [May 20, 2020 Beria Dep., Vol. I., 165-168].  Whether a jury would find Beria's statements or possible future live testimony credible is not the issue.

It is undisputed that Wicker did not speak English, and House did not speak German.  [House Dep. 27].  House testified that Wicker did not provide him with any way to contact Wicker directly and that Wicker never contacted House directly.  [House Dep. 38, 156, 333, 364, 366, 373]. House further testified that he was not privy to communications between Paramatma and Wicker or to Beria's communications with Paramatma or Wicker. [House Dep. 50].

In terms of concealment, according to House, he explained to Wicker in their August 2014 meeting that House had an ownership interest in LoTi and that he and Beria owned LoTi. [House Dep. 706; House Decl. ¶¶ 4-11].  Plaintiffs assert that this statement amounts to perjury since House also represents that he and Wicker spoke different languages.  House adds that he told Wicker in writing during a meeting in August 2014 that he and Beria owned LoTi and that LoTi would be developing the lots at the Redding tract.  [House Decl., Attachment 7]. House supplies copies of publicly available documents and checks he signed on LoTi's behalf and asserts that no fewer than four of Wicker's attorneys knew that House had an interest in LoTi – Beggs, Cirrito, McDonough and Kraby. House also points out that he was present for the closings on the purchase transactions, suggesting that he was not trying to hide his involvement and that his involvement was legitimate and lawful.

Regarding what House admitted, House explained that, once Wicker indicated that House reminded him of his deceased son, House agreed to temporarily hide his ongoing involvement in LoTi.  [PSMF 125-127].  Still, Wicker's purported trauma-based response to House does not account for why third-party Michael Wewers was needed to correspond with Wicker on LoTi

business such as the LCAs.  When questioned about Beria proposing that Wewers

correspond with Wicker on behalf of LoTi, House testified as follows:

> Q: Why couldn't Mr. Beria sign the letter?
>
> A. Ma'am, I don't know. You will have to ask Mr. Beria that.
>
> Q. You would agree with me that if Mr. Beria signed the letter on
> behalf of LoTi, Mr. Wicker would know that Mr. Beria had a
> relationship with LoTi, correct?
>
> . . .
>
> Q.  If Mr. Beria signed a letter on behalf of LoTi, then Mr. Wicker
> would know that Mr. Beria had a relationship with LoTi, correct?
>
> A.  I guess you could say that.

[5/20/20 House Dep. 159-161].

Viewing the facts in the light most favorable to the House Defendants, the

Court finds that genuine issues of material fact exist concerning what House knew

about the activities of Paramatma and Beria and, to the extent he had knowledge,

when he obtained it.[37] Likewise, genuine issues of material fact exist concerning

steps taken by House, if any, to conceal the alleged fraud.

Viewing the evidence in the light most favorable to Plaintiffs, and setting

aside the other providential occurrences that benefitted Defendants, a jury could

---

[37] This question of fact also bars summary judgment on Plaintiffs' claims alleging
breach of fiduciary duty and aiding and abetting breach of fiduciary duty.

reasonably infer, if nothing else, that the sharing of profits by House (TJH) and

Beria (LSC1) through their partnership in LoTi demonstrates that House was, in

fact, aware of and/or an active participant in Beria's conduct and/or

communications with Wicker and/or Paramatma.[38]  Similarly, a jury could

reasonably conclude that House merely acquiesced and/or was guilty of willful

blindness.

     For the reasons stated, the Court therefore finds that numerous issues of fact

preclude summary judgment disposition in favor of either party on Plaintiffs'

fraud-based claims.

### 2. Claims Based Upon Fiduciary Duty – Plaintiffs & House Defendants Move for Partial Summary Judgment (Counts III, IV)

     "It is well settled that a claim for breach of fiduciary duty requires proof of

three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and

(3) damage proximately caused by the breach."  Ansley Marine Const., Inc. v.

Swanberg, 290 Ga. App. 388, 391, 660 S.E.2d 6, 9 (Ga. App. 2008) (citation and

internal quotation marks omitted).

---

[38] While not emphasized in the briefs, the fact that House and Beria formed other corporate entities to place themselves in a position to continue to do business together [PSMF 95-100] is probative of the House Defendants' intent to defraud Plaintiffs.  Still, these are questions for the jury and not the Court.

In this case, each element presents factual questions.  House denies he was Wicker's fiduciary.  Rather, House argues that Paramatma was the party who owed a fiduciary duty to Wicker, and Paramatma's duty to Plaintiffs is not in dispute. The nature and scope of any duty owed by the House Defendants to Plaintiffs is very much in dispute.

Plaintiffs contend, at minimum, House owed Plaintiffs a fiduciary duty with respect to the River & Redding Properties. Plaintiffs assert that House held himself out as Wicker's agent and as a real estate broker, resulting in a fiduciary relationship.  <u>See</u> O.C.G.A. § 23-2-58.  Section 23-2-58 reads:

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between . . . ***principal and agent***; . . . and similar fiduciary relationships.

<u>Id.</u>  The Court agrees with Plaintiffs that House was an agent of Wicker and, thus, a fiduciary in some capacity.

House concedes that he may have owed a limited fiduciary duty to Plaintiffs with respect to the work he undertook and agreed to perform on the North Forsyth Properties.  House disputes any greater scope of duty.  House also adamantly denies that he breached any duty owed. According to House, he worked diligently

to maintain 1800+ acres for four years and acted consistent with Wicker's best interest. The scope of the fiduciary duty owed, and whether any breach occurred, are genuine issues of material fact.

The Court turns to Plaintiffs' claims that the House Defendants breached a fiduciary duty by failing to disclose material facts to Plaintiffs.  In terms of House's alleged failure to disclose Paramatma's misconduct, House argues that he had no knowledge that Paramatma was breaching his fiduciary duty to Wicker. House also argues that he had no obligation to investigate and discover (or disclose) Paramatma's alleged breach of fiduciary duty to Plaintiffs and that he never aided and abetted Paramatma.

With respect to matters House did, in fact, ultimately learn of, Plaintiffs allege that House failed to disclose material facts about attempted fraudulent conveyances of interest in the Westminster Apartments.  As one example, Plaintiffs identify House's discovery (pre-2017 and prior to the Westminster conveyance to SAKS) that Paramatma executed quitclaim deeds purporting to convey a 50% interest in Wicker, LLC and/or the other properties to SAKS for no consideration and the fact that House shared the information with Wicker, LLC Attorney Wendy Kraby.  Attorney Kraby represented both Wicker and House at the time.  House testified that Kraby advised House that she believed the

transaction was illegal.  [House Dep. 382-383].  Plaintiffs contend that House, as

Plaintiffs' agent and fiduciary, had an obligation and duty to notify Plaintiffs (not

Plaintiffs' attorney) which House failed to do. [Dkt. 497-1 at 42-45]. The scope of

House's fiduciary duty to Plaintiffs, and whether House's notification to Attorney

Kraby was sufficient is a jury question.

As is true concerning Plaintiffs' fraud-based claims, the Court likewise finds

that genuine issues of material fact preclude summary judgment disposition in

favor of either party on Plaintiffs' breach of fiduciary duty claims.

### 3. Joint Liability with Beria for Misappropriated "Lot Development" and "Land Clearing" Funds & Related Request for Disgorgement of Monies Paid or Rescission (Counts I, II, III, IV, VIII, X)

Plaintiffs assert that the House Defendants are jointly liable with Beria for

the misappropriated "Lot Development" and "Land Clearing" Funds.[39]

Alternatively, Plaintiffs assert that the House Defendants are individually liable or

that House ratified Beria's fraud.  Plaintiffs further seek disgorgement of all

monies paid to the House Defendants or rescission of the underlying agreements.

---

[39] Plaintiffs seek to recover from the House Defendants the remainder of the Excess Purchase Proceeds ($16,301,700 diverted to LSC1 for "Lot Development") and the LCA proceeds ($20.7 million). As noted earlier, the relevant LCAs were between Wicker and LSC1 (Beria).

As noted previously, the misappropriated "Lot Development" funds ($16,301,700) were deposited into LSC1's bank account, and the two LCA agreements at issue were between Wicker and LSC1 (Beria) and resulted in $20.7 million payment to LSC1 (Beria).  One of the LCAs, the one reportedly presented to House by Beria, called for payment to LoTi in the amount of $7.25 million. The Beria Defendants – LoTi included – defaulted as to liability on these claims.

## A. Joint Liability

Citing to Georgia state law governing partnerships, Plaintiffs first contend that House is automatically jointly liable with his "partner" Beria for the misappropriated "Lot Development" and "Land Clearing" proceeds.  [Dkt. 497-1 at 26-27].  However, LoTi was a limited liability corporation or LLC – not a partnership. Plaintiffs' conclusory statement that House is, *ipso facto*, jointly liable for this conduct because House referred to Beria as a business partner is neither authoritative nor persuasive. Plaintiffs assume that the *mens rea*/intent of Beria is imputed to House.

## B. Individual Liability

Regarding individual liability, Plaintiffs first contend that House knowingly received millions of dollars in payment from Plaintiffs without doing any legitimate work.  See Almond v. McCranie, 283 Ga. App. 887 (2007) ("a corporate

officer who takes part in the commission of a tort committed by the corporation is personally liable therefor") (citation omitted).  As described by Plaintiffs, House's active role included: "assisting the fraudulent procurement of LCAs by drafting the false scope, drafting communications misrepresenting to Mr. Wicker that work was ongoing, and his concealment including never informing Mr. Wicker that no work was being done. . . ."

Admittedly, House, as the contractor and developer, was responsible for describing the scope of work to be performed within each agreement.  House testified that he drafted legitimate LCAs that Beria used to manufacture fraudulent LCAs without House's knowledge.

Regarding the claim that no legitimate work was performed, House contends that he performed valuable services pursuant to the written agreements authorized by Paramatma and had no knowledge that Beria was altering the invoices (marking the charges up) before sending them to Wicker.  The record establishes that, at some point, development halted.  According to House, in the spring of 2015, Paramatma told House that Wicker wanted to pause the development on the North Forsyth properties because his "aura" reminded Wicker too much of Wicker's son, Michael (deceased).  House states that he continued to maintain the property with the understanding that development would resume.  [House Decl. ¶ 15].  House

further contends that Beria retained the excess monies paid while House was only paid the amount he initially requested and legitimately earned under the terms of the agreements.  Finally, House argues that he cannot be held liable for Beria's criminal conduct.

## C. Ratification

Plaintiffs' third argument is that, even if House claims he was not aware of Beria's early misdeeds/acting in concert with Beria initially, House is still liable because he subsequently ratified Beria's actions.[40]  Ratification requires knowledge of all material facts.  See Merritt v. Marlin Outdoor Advertising, Ltd., 679 S.E.2d 97, 102 (Ga. App. 2009) (citation omitted).

## D. Disgorgement, Rescission

Plaintiffs' fourth contention is that they are entitled to disgorgement of all monies paid to the House Defendants pursuant to the LDA, LCAs, and commission agreements.  Plaintiffs describe the agreements as "a means of papering theft" and contend the agreements are invalid, null and void.  [Dkt. 497-1 at 40].  Plaintiffs also argue that the agreements are invalid because neither House nor Beria had the

---

[40] Relying again on partnership law, Plaintiffs claim that the knowledge of the partnership is imputed to the partner.  [Dkt. 497-1 at 28].

requisite real estate or general contractor's licenses.[41]  Going further, Plaintiffs argue, alternatively, that if the Court determines that any of these written agreements are valid, that Plaintiffs are entitled to rescission.

### E. Conclusion

Whether the House Defendants are jointly or individually liable for the misappropriation of the funds paid by Plaintiffs pursuant to the LDA or LCAs and, if so, to what extent, is a question for the factfinder.  Summary judgment is likewise inappropriate regarding the validity of the agreements themselves and related commission agreements.

### 4. Plaintiffs' MPSJ Based Upon Unjust Enrichment / Money Had and Received (Count VIII)

Plaintiffs assert they "are entitled to recover every penny that the House Defendants actually received" under the equitable doctrine of unjust enrichment and that Defendants should not be permitted "to profit or enrich [themselves] at another's expense."  [Dkt. 497-1 at 39 (quoting Yoh v. Daniel, 497 S.E.2d 392, 394 n.12 (Ga. App. 1995))].  Plaintiffs point to the fact that the House Defendants

---

[41] The Court has already addressed the real estate broker's license questions and determined that genuine issues of material fact preclude summary judgment in favor of Plaintiffs on this issue.

have "retained the benefit of Plaintiffs' money" as unjust enrichment.  [Dkt. 497-1 at 39].

As previously discussed, the House Defendants dispute Plaintiffs' contention that House or TJH were enriched at Plaintiffs' expense.  Defendants argue that the services they provided to Plaintiffs were the result of arms-length transactions, that House identified smart investment properties for purchase, and that the House Defendants' development work has resulted in an increase in value for the real estate Plaintiffs still own.

The Court finds that genuine issues of material fact render summary judgment improper as to Plaintiffs' cause of action based upon unjust enrichment.

### 5. Declaratory Judgment Based Upon Attempts to Sell Wicker Property in 2018

Both Plaintiffs and Defendants raise the attempted sale of Plaintiffs' real property within their MPSJ.  Plaintiffs identify this conduct as more fraud and/or a breach of fiduciary duty while the House Defendants seek payment for finding a buyer.

### a. December 2018 Attempted Sale of Redding Property

On September 21, 2018, TJH entered into a "Consulting Fee Agreement" with Wicker, LLC providing for a $3 million dollar fee to TJH and LSC1 ("2018 Consulting Agreement").  The 2018 Consulting Agreement was executed by

Paramatma on behalf of Wicker, LLC, and, as referenced previously, Plaintiffs

contend that this is nothing more than a sham agreement. Plaintiffs challenge the

$3 million fee amount as well.  Plaintiffs identify the 2018 Consulting Agreement

as one of the ways House supposedly either aided and abetted Paramatma or failed

to disclose material facts resulting in a breach of fiduciary duty.

As purportedly authorized under the 2018 Consulting Agreement, in

December 2018, there was an attempt to sell the Redding Property. Plaintiffs claim

that Wicker was not aware that the Redding Property was going to be sold.

According to the House Defendants, Dr. Ramb was very much aware of the

potential sale as revealed by an extension of the buyer's due diligence period and

written approval of the sale of the Redding Property for $33 million.  [Dkt. 514-1

at 43; Exhibit 14].  Since Dr. Ramb was Wicker's attorney, Plaintiffs argue that

notice to Dr. Ramb was sufficient notice to Wicker.[42]

### b.  Attempted Sale of Etowah River Property

There were also attempts in 2018 to sell the Etowah River Property, another

property owned by Plaintiffs that is the subject of the stayed related civil action,

---

[42] Should Dr. Ramb be called to testify at trial (on any factual issue), the jury's role is to consider Dr. Ramb's testimony, weigh credibility, and make the necessary factual findings to render a verdict supported by the evidence.

styled <u>TJH, Inc., et al. v. Wicker, LLC</u>, 2:19-cv-87-RWS, discussed supra, n.3.

The House Defendants initiated the Etowah River Property Action alleging breach

of contract by Wicker, LLC for failing to pay House's fees under the terms of the

2018 Consulting Agreement.  The injunctive relief sought by the House

Defendants at that time was related to the pre-arranged sale of the Etowah River

Property to a purchaser located by House.

In their MPSJ, Plaintiffs cite the parties' Joint Preliminary Report and

Discovery Plan ("PRDP") [Dkt. 170 at 29, 33] and suggest that the Court issue a

ruling on a matter described by the House Defendants in the PRDP, namely,

"Whether Wicker LLC should be enjoined from selling the North Georgia

properties until Wicker LLC has paid the House entities TJH, Inc. and Etowah

Development Partners, LLC, $4.5 million" and "Whether TJH and Etowah are

entitled to damages of not less than $4.5 Million."  [Dkt. 497-1 at 23].  While the

House Defendants have filed a *lis pendens*, Defendants have not filed a

Counterclaim in this case seeking this relief.[43] Even though related, the Etowah

River Action is stayed pending disposition of the instant case.

---

[43] House has filed *lis pendens* (enjoining sale) based on his purported consulting
agreements.  [Dkts. 421, 422, 464, 465].

At this time, there is no motion to consolidate the Etowah River Action with the instant case.  In the event consolidation for purposes of jury trial makes sense, the parties may formally move for this relief.  In this posture, the House Defendants' state law claims for breach of contract related to the attempted sale of the Etowah River Property will not be litigated in this civil action.

### c.  Conclusion

Plaintiffs' MPSJ seeking a declaratory judgment on these issues is due to be denied.  The substantive legal issues regarding any potential *future* sale of the Wicker, LLC Properties is not properly raised in the instant civil action.

### 6.  Defendants' MPSJ Regarding Plaintiffs' Claims Based Upon Conspiracy (Count V)

As discussed, *supra*, House contests Plaintiffs' allegations that he was a co-conspirator of Paramatma, Beria, or both.[44]

"A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." Mustaqeem-Graydon v. SunTrust Bank, 573 S.E.2d 455, 461 (Ga. App. 2002) (citation omitted).

---

[44] The House Defendants also argue that Plaintiffs cannot establish any damages resulting from these transactions in that the properties that House identified and Wicker purchased are currently worth far more than Wicker paid for them.

Here, the House Defendants claim that Plaintiffs have not provided any evidence that they were acting in concert with Beria and Paramatma with any common design or mutual understanding to accomplish an unlawful purpose. House contends that there is no evidence he had any knowledge of Beria and Paramatma's communications with Wicker.  What House knew and when is a jury question.

Genuine issues of material fact preclude summary judgment disposition on Defendants' MPSJ for the same reasons discussed when evaluating the parties' respective MPSJ concerning Plaintiffs' fraud-based claims (Counts I, II).  If a jury were to find that House did not know about the fraudulent scheme as House contends, then there could be no agreement between House and/or Paramatma and/or Beria and, thus, no conspiracy.

### 7. Defendants' MPSJ Regarding Plaintiffs' Claims Based Upon Federal RICO (Count VI)

"Essential to any successful RICO claim are the basic requirements of establishing a RICO enterprise and a 'pattern of racketeering activity.' A RICO enterprise exists 'where a group of persons associates, formally or informally, with the purpose of conducting illegal activity.'" Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1264 (11th Cir. 2004) (citation omitted).

"Racketeering activity" includes such predicate acts as mail or wire fraud, see 18 U.S.C. § 1961(1), which "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." Lechter v. Aprio, LLP, 565 F. Supp. 3d 1279, 1314 (N.D. Ga. 2021) (quoting Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010)).

A pattern of racketeering activity may be established where evidence exists that "(1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." Jackson, 372 F.3d at 1264 (citing, *inter alia*, 18 U.S.C. § 1961(5)).

Simply stated, one of Plaintiffs' federal RICO theories is that Paramatma, Beria, and House purposefully used Wicker, LLC as a means of perpetrating fraud, i.e., an illegal RICO enterprise. Plaintiffs also allege the existence of an "association-in-fact" enterprise. House argues that he is entitled to summary dismissal of Plaintiffs' RICO claims because he was not a member in Wicker, LLC and likewise had no interest and no involvement in the LLC's operation. However, an enterprise does not require a formal relationship. See 18 U.S.C. § 1961(4) (defining "enterprise" as "any individual, partnership, corporation, association or

other legal entity, and any union or group of individuals associated in fact although not a legal entity"). While a reasonable jury might infer from the evidence of record that House is less culpable than Paramatma and Beria, genuine issues of material fact as to all of the above causes of action defeat the House Defendants' MPSJ.

Again, summary judgment disposition is inappropriate on these claims. The Court declines to parse out portions of the alleged RICO violations and attempt to rule on any discrete issue as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court finds that partial summary judgment disposition is inappropriate.

Accordingly, it is hereby **ORDERED** as follows:

1. Plaintiffs' MPSJ [Dkt. 497] is **DENIED**.

2. The House Defendants' MPSJ [Dkt. 498] is **DENIED**.

3. Plaintiffs' Motion to Strike the House Defendants' MPSJ [Dkt. 516] is **DENIED as MOOT**.

4. Plaintiffs' Motion to Strike the House Defendants' Reply Brief [Dkt. 527] is **DENIED as MOOT**.

5.  The parties shall submit their Joint Consolidated Pretrial Order ("CPTO")

    **within 30 days**.

6.  This matter will be calendared for **JURY TRIAL** in the Gainesville

    Division.

**SO ORDERED** this 28th day of September, 2022.


_____
**RICHARD W. STORY**
United States District Judge